IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 2, 2016

**IN RE: BRYSON C.**

**Appeal from the Juvenile Court for White County**
**No. 4161     Sam Benningfield, Judge**

---

**No. M2015-02428-COA-R3-PT – Filed July 18, 2016**

---

The Juvenile Court for White County ("Juvenile Court") terminated the parental rights of Briana M. ("Mother") to the minor child Bryson C. ("the Child") after finding and holding that grounds existed to terminate for abandonment by willful failure to visit and by willful failure to provide support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i); for failure to comply with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). The Juvenile Court also found that it was in the Child's best interest for Mother's parental rights to be terminated. Mother appeals to this Court. We find and hold that clear and convincing evidence was not shown that grounds existed to terminate Mother's parental rights for abandonment by willful failure to provide support or for failure to comply with the permanency plan, and we reverse that portion of the Juvenile Court's order terminating Mother's parental rights for abandonment by willful failure to provide support and for failure to comply with the permanency plan. We further find and hold that the evidence in the record on appeal does not preponderate against the Juvenile Court's finding by clear and convincing evidence that grounds existed to terminate Mother's parental rights for abandonment by willful failure to visit and for persistent conditions, and that it was in the Child's best interest for Mother's parental rights to be terminated. We, therefore, affirm the termination of Mother's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed, as modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which W. NEAL MCBRAYER and BRANDON O. GIBSON, JJ., joined.

J. Brad Hannah, Smithville, Tennessee, for the appellant, Briana M.

Herbert H. Slatery, III, Attorney General and Reporter; and Kathryn A. Baker, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

## OPINION

## <u>Background</u>

Mother was married to Dewey M. when the Child was born in 2012. Dewey M., however, is not listed on the Child's birth certificate as the Child's father. Instead, Robert C. ("Father") is listed on the Child's birth certificate as the Child's father. The Child was taken into State custody on July 24, 2014, and was adjudicated dependent and neglected on August 19, 2014. Mother previously had lost custody to three of her other children due to environmental neglect. The Child has been in foster care continuously since July 24, 2014.

The State of Tennessee Department of Children's Services ("DCS") filed its petition ("the Petition") on July 7, 2015 seeking to terminate the parental rights of both Mother and Father[1] to the Child. Dewey M. surrendered his rights to the Child in July of 2015. The case proceeded to trial in November of 2015. At the time of trial, the Child was three years old.

Jamesia Evans, who has been the DCS family services worker for the Child's case since July of 2014, testified at trial. Ms. Evans testified that Mother has not paid any child support for the Child. More specifically, Mother did not pay any child support during the four months preceding the filing of the Petition. Ms. Evans testified that Mother was aware of her duty to support and that Mother was able-bodied and capable of working to support the Child. Ms. Evans testified that Mother reported that she did factory work and that she had worked for a temporary agency.

Ms. Evans testified that Mother did not visit the Child during the four month period preceding the filing of the Petition. Mother was not incarcerated during the four month period preceding the filing of the Petition. A visit had been scheduled to occur nine days before the Petition was filed. This visit was cancelled and rescheduled because the Child was going on vacation with the foster family. Ms. Evans agreed that Mother stated that she did not want the Child to go to Florida with the foster family.

Mother visited the Child on the day she was served with the Petition, which was July 7, 2015. Ms. Evans explained that this was the visit that had been cancelled and re-

---

[1] Father did not appear at trial, although his attorney did. Father did not file an appeal of the Juvenile Court's final order. As such, we need not, and do not, discuss in this Opinion facts that pertain solely to Father.

scheduled.  Mother also visited the Child on October 1, 2015.  Ms. Evans testified that these two visits are the only visits Mother has had with the Child since January of 2015, and each of these visits was two hours long.  During the July visit, the Child recognized both Mother and Father and ran to Father.  During the October visit, the Child did not recognize Mother and asked who she was.  Father was not present during the October visit.  Ms. Evans testified that Mother brought snacks but no toys to the two visits.

Ms. Evans testified that Mother knew that the Child was in foster care and was aware of how to set up visits.  Mother was informed on September 23, 2014; June 15, 2015; and October 1, 2015 that willful failure to visit or support during the four month period was grounds for termination of her parental rights.  Mother signed the receipt of the Criteria and Procedures for Termination of Parental Rights on September 23, 2014; on June 15, 2015; and on October 1, 2015.

Ms. Evans testified that Mother's mother ("Grandmother") supervised Mother's visits with the Child from November of 2014 until January of 2015.  Ms. Evans stated:

> [Mother] did ask me if she could get somebody to supervise her visits.  And I told her that if she could get somebody to pass a background check, that they could supervise her visits.
>
> So from May until - - I'm sorry, not May.  But from November until January her mom was supervising visits.

Ms. Evans agreed that Mother recently requested weekend visits, and stated: "She asked for them to be in Smithville. . . .  I told her that wouldn't do visits in Smithville; that I could do them in Sparta."

Ms. Evans testified that an initial permanency plan ("Permanency Plan") for the Child was created on August 19, 2014, which required that Mother maintain safe and stable housing, maintain employment, have an A&D consultation and follow all recommendations, maintain visitation, and maintain contact with DCS.  The Permanency Plan was ratified on September 23, 2014.  The Permanency Plan was revised on February 27, 2015, but contained the same goals and requirements.  The revised Permanency Plan was ratified on March 2, 2015.  The Permanency Plan again was revised on May 22, 2015, and contained the requirements that Mother have safe and stable housing, undergo a parenting assessment and follow all recommendations, have a stable mental health assessment and follow all recommendations, submit to random pill counts, remain drug free, submit to random urine and hair follicle drug screens, be open and honest in assessments, and not associate with any known drug users or abusers.  The May revision of the Permanency Plan was ratified on June 8, 2015.  Ms. Evans testified that the

requirements of the Permanency Plan were reasonably related to remedying the conditions that necessitated foster care.

Ms. Evans agreed that the Permanency Plan initially had approximately five requirements, but when the new plan was prepared on May 22, 2015 and ratified on June 8, 2015, approximately ten new requirements were added including a mental health assessment and a parenting assessment, neither of which previously had been required. When asked why she added a mental health assessment and a parenting assessment to the Permanency Plan requirements, Ms. Evans stated:

> I couldn't understand how somebody could go without seeing their child. And the parenting, that's the reason why I added it. Because during the beginning of this case, she was working the plan, very adamant about doing what she was supposed to do, visiting [the Child] regularly.

> And then in February, she kind of just fell off the face of the earth. I contacted her. I couldn't get in touch with her. Couldn't find where she was. So at that point, I questioned mental health and parenting.

Ms. Evans agreed that the requirement to submit to random pill counts was only necessary if pills were prescribed when Mother did her mental health assessment, and there never were any pills to count because pills were not prescribed for Mother. Ms. Evans explained: "And the reason for that is because they were using - - shooting up pills. That's the reason I would require pill counts if pills were prescribed." The order from the review hearing on October 5, 2015 stated that an A&D assessment would be needed only if Mother tested positive for drugs.

Although Mother did complete a portion of her drug treatment under the initial Permanency Plan, she did not do aftercare. Mother received a certificate for completing intensive outpatient, and she provided that to DCS in August of 2014. Mother had a negative drug screen on September 23, 2014, and another on October 7, 2014.

Ms. Evans stated that Mother had not been employed consistently throughout the case. When asked if Mother was employed in October of 2015, Ms. Evans stated: "She reported she was employed. I never got a check stub to verify that, but I did call her employment." In October of 2015, Mother was working at Subway. Ms. Evans contacted Subway, but Mother was not there.

A review hearing was held on December 9, 2014, and it was determined that Mother had housing, visited regularly, maintained contact with DCS, and had completed

IOP[2] at that time. The order noted that the case manager needed to drug screen Mother. At that time, DCS was recommending unsupervised visits if Mother's hair follicle drug test came back negative. Ms. Evans agreed that at that time Mother was in substantial compliance with the requirements of the Permanency Plan.

Ms. Evans agreed that in December of 2014, Mother was a negative hair follicle test away from being granted unsupervised visits with the Child. Ms. Evans stated that the problem with getting the hair follicle test scheduled in December was that Mother kept refusing to give a date. Ms. Evans stated: "During that time, On-Site could come to the office at any time. I just needed [Mother] to tell when she could do it."

Mother contacted Ms. Evans on January 12, 2015, and told Ms. Evans that she had a new job. At that time, Ms. Evans requested a hair follicle test. Ms. Evans told Mother to let her know when she could get to Sparta for this test. On January 20, 2015, Mother contacted Ms. Evans and requested help in getting transportation to her place of employment. Ms. Evans was asked if she talked to Mother about setting up the hair follicle test at that time, and she stated: "I wasn't in the - - she was in Sparta. I was in Warren County. I just called a coworker to take her to work. I couldn't talk to her about anything at that time. She was actually crying when she called me." Mother unsuccessfully attempted to call Ms. Evans on February 18, 2015. Ms. Evans attempted to return the call, but the call was not answered.

Ms. Evans agreed that the order from the review hearing done on March 2, 2015, stated that Mother had completed IOP; had full-time employment, housing, and transportation; maintained contact with DCS; and visited regularly. Ms. Evans stated that Mother "had only missed February [visits], so at that point she was in substantial compliance with everything else." At that time DCS still was recommending unsupervised visitation pending a negative hair follicle test.

In March of 2015, DCS told Mother that she could have unsupervised visits if she had a negative hair follicle test, but Mother did not take the test. When asked why she did not request a random drug test, Ms. Evans stated: "At that time, I had no speculation that she was using drugs. So if she told me what day she could come in, she - - I had no issue with her doing a hair follicle then."

Ms. Evans agreed that in March of 2015, the Permanency Plan contained no requirement that Mother complete a parenting assessment. The Petition was filed July 7, 2015. Ms. Evans agreed that there was about a five day gap from the time of the court

---

[2] We are unable to determine from the record now before us exactly what "IOP" stands for, although in this case it may stand for intensive outpatient program.

order stating that Mother was in substantial compliance with the Permanency Plan and the beginning of the four month period preceding the filing of the Petition.

On June 15, 2015, Mother had a negative urine drug screen. In June of 2015, the new requirements were put into the Parenting Plan, which stated that a reasonable goal would be completion within six months. Ms. Evans agreed that at the time of trial it had not been six months since the new requirements were added to the Permanency Plan.

Ms. Evans was asked if Mother had completed the tasks in the Permanency Plan, and she stated: "[Mother] does not have safe and stable housing. I can't verify that she's remained drug free continuously throughout the case. She just had a mental health assessment and a parenting assessment this week." Ms. Evans testified that appointments for these assessments had been offered to Mother for August 25, 2015, and September 14, 2015. When asked why Mother did not make those appointments, Ms. Evans stated:

She called on August 25th and stated - - and she asked me what date [sic] was the parenting assessment on the 27th. I told her that her parenting assessment was supposed to be that day.

She called later in the day, so she had already missed her time. And I told her to call them to see if they could work her in, but they couldn't.

Ms. Evans testified that she had told Mother the correct date and time of the appointment during the July 7, 2015 visitation. Ms. Evans does not yet have the results of the mental health and parenting assessments that Mother completed mere days before trial. Ms. Evans stated that she was told that the office preparing those results has a ten day turnaround.

Ms. Evans was asked if she had a hard time finding Mother, and she stated:

During the beginning of the case, [Mother] and [Father] both worked their plan. They were diligent in keeping contact with the department.

Around February, I found out that they weren't - - in February, I found out that they weren't visiting anymore. So in February, I went to the home at 218 Bloomington Road here, in Sparta, and I left a card there. I knocked. I sent text messages to the phone that I had for [Mother]. I didn't get a response. I continuously called her. I continuously texted. I went to the house two more times. And on the third time I went to the house, I was told by a neighbor that they didn't live there anymore, that they had been evicted.

Mother had not contacted DCS to tell them that she wasn't living there anymore.

When asked if she were able to reach Mother by phone, Ms. Evans stated:

> Not the phone calls. And I wasn't able to leave a voicemail because it said the voice messaging system wasn't set up. With the text messages on Verizon phones, the text message shows you when it's not deliverable. And every text message that I sent her went through, but I never got a response.

After losing contact with Mother in February of 2015, Ms. Evans finally reestablished contact with Mother in April of 2015. Mother told Ms. Evans that she had been evicted for "losing her job and something else." Mother gave Ms. Evans her new address, and Mother "just said that she had been on hard times."

After reestablishing contact with Mother, Ms. Evans went over the Permanency Plan with Mother and set up a hair follicle test. When asked if Mother took the hair follicle test, Ms. Evans stated:

> She did do that hair follicle when I saw her on - - I didn't see her before the hair follicle. I called her to tell her when it was because On-Site was only going to be at the courthouse one day. I informed her before the hair follicle when it would be. And the day that I saw her, her hair was dyed jet black.

Ms. Evans stated that this was not Mother's usual hair color. Ms. Evans testified that she had spoken with Mother several times about the importance of not changing the color of her hair. Ms. Evans agreed that in her experience people try to beat the drug tests, and she stated that dying their hair is the "[n]umber one way" of trying to do that. Mother took the hair follicle test on April 20, 2015, and it was negative for all substances. Ms. Evans was asked if she had told Mother that non-ammonia hair dye would not affect a hair follicle test, and Ms. Evans stated: "I didn't tell her that. She told me that." Ms. Evans stated: "In the beginning of any case, I let them know they are not to dye their hair in any form during the duration of the case." Ms. Evans testified that she did tell Mother this.

Ms. Evans testified that on the day of trial it appeared that Mother had again altered her hair color. Ms. Evans stated: "That is not her natural hair color." Ms. Evans was not able to verify at the time of trial whether or not Mother was sober.

After April of 2015, Ms. Evans again lost contact with Mother until later in May of 2015. In May, Mother texted Ms. Evans and requested a visit, and Ms. Evans told Mother to come by the office to set up a visit. Ms. Evans planned to drug test Mother, but Mother never came by the office to set up a visit. Ms. Evans was asked if there was a reason why the visit could not be set up by phone, and Ms. Evans stated: "No. There is no reason. I needed to drug screen her. That's the reason I wanted her to come in and talk to me." After Ms. Evans told Mother to come to the office, Mother stopped texting Ms. Evans. The next time Ms. Evans had contact with Mother was in court on June 8, 2015. At that time, Mother reported that she was staying with a friend and did not have housing or a job.

Mother went to the DCS office on June 15, 2015, and Ms. Evans reviewed the Permanency Plan with Mother and set up a visit for June 29, 2015. Ms. Evans had to reschedule that visit because the Child was going on vacation with his foster family. Ms. Evans rescheduled for July 7, 2015, and Mother attended that visit.

When asked if Mother had kept in contact since that time, Ms. Evans stated: "No. It's been very sporadic." Ms. Evans testified that she has attempted to provide services to Mother. When asked, Ms. Evans agreed that she had spent most of her time trying to locate Mother. Mother has not kept in contact with Ms. Evans.

Mother reported that she does not know Father's whereabouts and that she has a new boyfriend. When Ms. Evans was asked about the day she located Mother to serve the Petition, she stated:

I actually had started texting [Mother] that morning. And I had asked her - - along the lines of talking to her, I asked her if she knew where [Father] was. She told me she didn't know.

She said that he could possibly be in Cookeville or back in Kentucky. So she told me that she hadn't had contact with him in a couple of months.

I asked her for her address, told her that I needed to do random home visits and I needed to know where she was living, so she gave me the address of 2075 River Hill Road.

So myself and another coworker went to River Hill Road. When we got there, there was a gentleman that answered the door. He said that [Mother] wasn't there. He said that she had gone to Keith's Grocery - - or

8

Keith's Market. I'm sorry. So I asked him - - well, I asked him if he knew when she would be back and he said he didn't.

There were two children in the home, so when I left there, I did request a well-child check because she was not supposed to be living anywhere there were children living.

Later on that day, the sheriff's department, they went out and they found [Father] and [Mother] present in the home.

Since the Child came into custody, Mother has provided DCS with more than five phone numbers and more than five addresses. As far as Ms. Evans knows, Mother has not been living in her current home for more than six weeks.

Ms. Evans visited the home where Mother lives "last Friday." When asked to describe the home, Ms. Evans stated: "It's cluttered. It needs to be cleaned. It is a three-bedroom house." Mother reported that she lives there with her boyfriend, her boyfriend's father, her boyfriend's mother, and her boyfriend's son who comes every other week. Ms. Evans has not done background checks on the other residents of Mother's home. Ms. Evans asked about where the Child would sleep if he were with Mother. Ms. Evans stated: "[Mother] took me to that room. And that room had a full-size tanning bed in that room and it was cluttered as well," but there was a bunk bed for the Child. Ms. Evans observed that there were three dogs outside and one inside when she visited the home. Ms. Evans testified that she was told that one of the dogs was vicious.

After Mother completed the IOP in 2014, Ms. Evans received additional allegations from another person that Mother was using drugs. Ms. Evans stated: "That's the reason I wanted to regular drug screen her. And if she did test positive, do another assessment, yes." Ms. Evans stated that the April drug screen was scheduled, but the other screens were random. Ms. Evans did a drug screen on June 15, 2015, and attempted to do one on July 1, 2015, but Mother said she could not urinate. A drug screen also was done on October 1, 2015.

Mother reported that she is not employed. Ms. Evans stated: "She reported that she had an application in at Lowe's in McMinnville. And I did give her another option, but she said her paramour thought that it wasn't a good idea." During the week prior to trial, Mother reported to Ms. Evans that she was not working.

Ms. Evans testified that "[the Child] is a very intelligent three-year old child, very bright, active, friendly, talkative. He's very smart." The Child does not have any special

needs. Nor does he have a medical condition. Ms. Evans stated that "[h]e has random nosebleeds, but that's about it." Ms. Evans testified:

> When [the Child] first came into custody last year, the only word he ever said was "no." Last month when I went to see [the Child], the foster parent asked me to ask him what was on his shirt. I asked [the Child] what was on his shirt. He looked down and he told me that it was an excavator. So he recognized the tool that was on his shirt.

> He's able - - when I transported him to the visit in July riding down the street, he pointed at animals. And I asked what they say. He'd tell me what the animals say. He'd tell me what the animal was.

The Child has been in his current foster home for six months. Ms. Evans stated that "[h]e's doing great" there. The Child's current foster family wants to adopt. Ms. Evans stated that the Child is "[v]ery" bonded with his foster family.

Ms. Evans does not believe it would be in the Child's best interest to be with Mother. The Child was removed from Mother's custody more than six months ago. Ms. Evans testified that the Child was removed because "[b]oth parents admitted to shooting up different sorts of drugs. They were consistently high." Mother has not maintained regular visitation or contact with the Child. Ms. Evans does not believe that Mother has a meaningful relationship with the Child. Mother has not made an adjustment to her circumstances, conduct or conditions to make it safe and in the Child's best interest to be in her home. Ms. Evans believes that a change in caretakers would have a negative impact on the Child psychologically.

Foster Mom testified that the Child has been in her home since May of 2015. Foster Mom and her husband have four children, a daughter from her husband's previous marriage and three children together. They also have the Child and one other foster child in the home. Foster Mom explained that her step-daughter is at college, and she comes home for the weekends. Foster Mom testified:

> [The Child] has really blended into our home just seamlessly from day one. He - - until we got our youngest foster daughter, he was the baby of the family; and he's just very doted over.

> He - - my boys play with him. My older daughter is almost like a second mother to him. She babies him. She helps me put him to bed. I mean, we adore [the Child].

Foster Mom testified that the Child whined a lot and was not potty trained when he came to her home. She stated: "it was really hard to know what he wanted because he pointed and grunted and he whined. I - - it was hard for me to be away from him because he clung to me. . . . [H]e really just was very anti-social. He did not play well with other kids. . . . [H]e screamed a lot . . . ."

Foster Mom stated that those behaviors no longer exist. Now, the Child is potty-trained, he speaks using sentences, "he initiates conversations with other kids," and "he doesn't scream anymore at all." Foster Mom explained that they had the Child evaluated by a speech therapist because they thought he was having hearing problems. The Child had tubes put into his ears. She stated that the tubes helped "[t]remendously." Foster Mom stated that the Child potty-trained within about four to six weeks of coming to their household.

Foster Mom was asked how the Child has grown since coming to her house, and she stated:

> When [the Child] first came into our home, he wasn't saying a whole lot. He was not very social. He clung to me just like he just was very scared. He's very uncomfortable around any men, and not very approachable by his peers. He didn't play well with other kids. He kind of was "no" when people tried to approach him. But he was clung - - very clingy to me. He whined a lot. He just acted really - - just very insecure.

> Since then, it's taken time, but he - - he is the most just - - he's just the most pleasant little boy that you have ever been around. He is very social. He has a lot of friends, just in our group of friends, the little boys that he plays with. He has friends at school. He's very social, pretty much in any situation.

Foster Mom testified that the Child looks up to the other children in her household and "[w]hen he sees them, he comes running." She stated that he plays with her sons who have tried to teach the Child to play T-ball.

Foster Mom testified that the Child is "very bonded" to her and her husband and that he loves them. The Child calls Foster Mom "mommy" and Foster Mom's husband "daddy." Foster Mom stated: "I love [the Child]. I would give anything in the world for him." Foster Mom and her husband want to adopt the Child, if he becomes available for adoption. She stated that she "very much want[s] to [adopt the Child]." Foster Mom has never met Mother.

Mother testified at trial and admitted that the Child was removed from her custody due to drug exposure. When asked what she did to remedy the problem, Mother stated that she went to rehab at New Leaf in Cookeville for sixteen days and then did outpatient care for a few weeks. Mother completed the program and received a certificate. She provided the certificate to DCS. When asked about after-care, Mother stated: "I did a couple of meetings, but after that, it was mainly work." Mother testified that she had taken "quite a few" drug screens during the case and never failed one.

With regard to the Permanency Plan, Mother stated that she submitted to drug screens, did an A&D assessment and followed the recommendations, completed her IOP program, and refrained from associating with known drug users. Mother also testified that she completed the mental health and parenting assessments. When asked how these assessments went, Mother stated: "It went great."

Mother was asked why she thought it was okay to dye her hair, and she stated: "Well, because at the beginning, I told them that I do dye my hair. And she said as long as there was no chemicals or ammonia, it would be okay so - - . . . ." Mother stated that she uses a hair dye that is "[a]mmonia free."

Mother was asked why she did not take the hair follicle test in December, and she stated: "Transportation has been a big issue for me." When pressed, Mother stated: "I guess, I don't have a reason. Transportation was an issue." Mother was asked why from December through March DCS was unable to do the hair follicle test, despite the fact that this test was the only thing that Mother needed to do to be given unsupervised visitation. Mother stated: "I don't know." Mother admitted that during that time period she managed to get to work. Mother was asked if was true that she was able to make it to visits in January and February, but could not make it to have the hair follicle test, and she stated: "I guess. Whatever." Mother stated that her mother took her to visitations, but avoided giving an actual answer when asked why her mother could not have taken her to do the hair follicle test. Mother stated: "She worked. . . . I don't know. You would have to ask her that." Mother testified that her transportation now was stable, and stated: "I have access to two vehicles right now any time that I need them."

When Ms. Evans was asked if Mother ever told her transportation was an issue with regard to doing the hair follicle test, Ms. Evans stated:

> She never told she [sic] had issues with the transportation for the hair follicle. The only time I found out she had transportation issues was the day she called me on January 20th saying she was going to lose her job if she didn't get to work.

* * *

I was willing - - during - - when this case first started, I was really amped about knowing that this child was going to be reunited with his parents.

So I was amped about giving her a hair follicle. Told [Father] I would give him one as well. Transported him to court. Transported him to visits.

So there was never an issue with her saying, hey, I need you to come get me so I can do my hair follicle. It was all dependent on her telling me, this is when I can make it because she was working during that time.

I am not going to schedule a hair follicle during a time that she's working. So she was told to let me know when she could do it. She never did that.

Mother was asked why her hair was dyed on the day of trial. She stated: "Because I have my hair - - well, I originally dyed it for Halloween, but because I do." Mother insisted that Ms. Evans told her that she could dye her hair with ammonia-free dye.

Mother testified that she could pass a drug screen if one were administered on the day of trial. When asked if it had been easy to become clean, Mother stated: "It wasn't easy, but I'm clean." Mother believes that it is easier for her to remain drug-free when Father is not around. She stated: "The last contact I had with him was a message online telling me that he wasn't going to be here." Mother was asked if she had been living with Father in July of 2015, when Ms. Evans visited the home, and she stated: "We were off and on a lot in the relationship so far. I was, but I wasn't - - yes and no."

Mother testified that she lived at 218 Brewington Road from January of 2015 through March of 2015. Mother was asked if she maintained contact with DCS. She testified that she did not always have a phone, but she would borrow a phone to text the case worker. Mother stated: "I would tell her who it was, whose phone I was on, and if I was able to, I would give her a number that she could get ahold of me on." Mother stated that she did not always receive a response when she sent these texts.

Mother has been at her current address for three months. She has known her boyfriend for three months. Mother moved in with her boyfriend a "couple of weeks" after meeting him. Mother is twenty-five years old, and her boyfriend is twenty-seven

13

years old. Mother's boyfriend lives with his parents. Mother testified that her boyfriend does have a job and does not use drugs.

When asked about her employment, Mother stated:

> When I got out of rehab, I started working through Wise Staffing in Cookeville, Tennessee at the temp agency. I maintained a job then. They had me working at HMI after I got out. And then my assignment ended there.
>
> And then I started working at PMI in Sparta. I worked there for a while, and then I got let go due to a medical issue.
>
> And then I had trouble finding a job again after that.

Mother testified that she had trouble finding employment from March or April of 2015, through the time of trial in November of 2015. Mother was not working at the time of trial. She stated that she was looking for a job. Mother testified that she had been without a job for "[a]lmost three weeks." She stated that prior to that, she had a job two months earlier at Subway. Mother testified that she worked 30 to 40 hours per week at Subway and that she worked there for two months. Mother quit the job at Subway. When asked why she quit, Mother stated: "Because I got wrote up for something that I wasn't there for." Prior to working at Subway, Mother worked at PMI from September of 2014, through March of 2015.

Mother was asked what medical issue resulted in the loss of her job, and she stated: "I found out I had Hep C." When asked how she contracted this, Mother stated: "I am unsure right now." Mother was asked if she could have gotten it from intravenous drug use, and she stated: "I have had it since before I started; that is what the doctor told me."

Mother was asked about her visits with the Child, and she testified: "Visitation was great when the case first started. I visited with him. Our visits were really good." These visits occurred "every other week or so." In January of 2015, Mother was having home visits with the Child. She explained:

> My mother was my home visit supervisor. We would go and pick him up, either Saturday or Sunday at 7:00. Meet the foster parent at the Hardee's in Smithville, Tennessee. We'd go pick him up and bring him to either my house or my mother's house and keep him and return him between 6:00 or 7:00 that evening.

14

When asked what they would do during visits, Mother stated:

> Watch movies. And he had his own bedroom at the time, so he had all of his toys and stuff in his bedroom. I would cook him dinner. We would go out to breakfast. I would cook him lunch. We would eat dinner together. We would play outside. My mother has animals at her house, we would play with them.

Mother testified that the Child knows who she is and calls her "mom" during visits. When asked if she felt like she and the Child had a bond, Mother stated: "Yes, I do." Mother was asked what her relationship with the Child had been like before he was removed from her custody, and she stated: "I took care of him. His father worked all the time. I was always with him. We had a very strong relationship."

Mother testified: "I requested visits on the weekends. My caseworker told me that she was not doing weekend visits. I asked her why, but I really didn't get a reason." Mother further stated: "I requested weekend visits because of the way my schedule was working. It was a very sketchy and inconsistent schedule." Mother was asked about the testimony given by Ms. Evans with regard to requesting Mother come to the office to schedule a visit in May, and Mother stated that she could not recall this incident. When Mother was asked about the visit that was cancelled and rescheduled in June and her alleged objection to the Child going on vacation with the foster family, she stated:

> At first, I didn't agree with it because I mean, he was going out of the state of Tennessee. And I guess I was paranoid anything could happen to him.

> So at first, no, I didn't agree with it. I wasn't even notified or told prior to that he was even going to be going anywhere, so, at first I disagreed, yes.

With regard to the allegation that she had visited with the Child only twice during this year, Mother stated: "I visited more than twice this year." Mother could not remember how many times she had visited. Mother asserted that she had done at home visits with the Child in January, February, and March of this year because she thought that it was "March or April that [she] lost her job." Mother stated that during those visits she, her mother, the Child, and Father were present, but no one from DCS was present.

15

Ms. Evans was asked about Mother's testimony that she had visits with the Child in February or March of 2015, and Ms. Evans stated that Mother never reported to DCS that she had any visits with the Child in February or March. Ms. Evans further stated:

> When I asked her why she hadn't visited since January, she said she doesn't know.
>
> So when I asked her that question, I was under the assumption that she was admitting that yes, I haven't visited since January because I did ask her that when I saw her in April. . . . I was concerned. She wasn't visiting. Prior to me finding out she wasn't visiting, it was very regular. I was supervising it, the visits.

Ms. Evans explained that Grandmother supervised the visits beginning in November and that Mother was doing well from November until January.

Mother admitted that she has paid no child support for the Child. Mother stated: "I did not know that I was supposed to be actually paying child support." Mother was asked who she thought was supposed to be taking care of her child, and she stated: "I am supposed to." Mother stated: "I was never told anything about having to pay child support. I have never signed anything for child support or anything, period. . . . I support him when I see him, yes. When I have him, I - - . . . ."

Grandmother testified at trial that Mother was doing well since she underwent drug treatment. Grandmother stated that Mother is doing better now that Father is no longer in Mother's life.

Grandmother testified that she supervised visits between Mother and the Child. When asked how often she supervised visits, Grandmother stated:

> I had just started a job at Wal-Mart. And whenever I had a day off, which was more convenient for the foster parent, on Saturdays or Sundays. Most of the time it was on Sundays. And I would spend my own money in my own car and go get my grandson.

Grandmother was asked about the interaction between Mother and the Child during visits, and she stated: "She spoils him." Grandmother testified that Mother would bring snacks for the Child and make sure he had diapers, toys, and clothes for the visits. She testified that the Child recognizes Mother.

16

Grandmother testified that she started supervising the visits between Thanksgiving and Christmas of 2014. Grandmother stopped supervising the visits in February or March of 2015. When asked why the home visits stopped, Grandmother testified: "Because I did not feel like it was a place for my grandson to be at that point because things had changed in their life. I didn't think he would be safe. He would be safe at my home, but not around [Father] at that point." Grandmother did not trust Father. When asked to explain further, Grandmother stated that she noticed "some changes" in Father, and that she did not feel safe around him so she "kept trying to pull [Mother] away," and she felt it was better for the Child to not be there. Grandmother admitted that she suspected drug use, and that she stopped the visits in February or March. The last time Grandmother saw the Child was in March of 2015. Ms. Evans testified that she was not aware that Grandmother had suspended the visits due to safety concerns.

When asked if she thought it would be in the Child's best interest to sever his relationship with Mother, Grandmother stated:

> No. Things have changed a whole lot since the last time I seen my grandson. She's in a better place, and I am in a better place.
>
> I have had my job for a year now. It's - - you know, on both ends, things have changed. The attitudes have just changed.

Mother told Grandmother in January of 2015 that all she needed was to have a negative hair follicle test in order to start unsupervised visitation. When asked why Mother did not go have the test done, Grandmother stated: "All I was informed of was that [Ms. Evans] hadn't set up any appointment. If she had set up an appointment, I would have made a point to help her get to wherever she needed to go." Grandmother stated: "I tried to do my best if it was just her. With [Father], I couldn't do it."

Grandmother knew Mother had been dating her current boyfriend for two and a half or three months, but did not know how long Mother had been living with him. Grandmother stated: "I do know she had been living with my brothers in Smithville for a while." Grandmother did not know why Mother lost her job at Subway. She also did not know why Mother stopped talking to the DCS caseworker in February of 2015. When asked if she would have helped Mother with transportation if necessary, Grandmother stated: "I would have tried my darndest if I didn't have to work. My work is important. I am single, so my work is important to me."

After trial the Juvenile Court entered its detailed order on November 17, 2015 terminating Mother's parental rights to the Child after finding and holding, *inter alia*:

13. [The Child] was placed in the custody of the Tennessee Department of Children's Services due to dependency and neglect on July 24, 2014.

14. In a prior DCS case [Mother] lost custody of three other children due to environmental neglect.

15. [The Child] was adjudicated to be dependent and neglected on August 19, 2014 by the Juvenile Court of White County, Tennessee.

16. The Court made the following findings of fact in its adjudicatory order:

The Department received a referral alleging drug exposed child as to [the Child] (1 year old) by his parents, [Mother] and [Father]. Case Manager (CM) Mickie Gardenhire, CM Jessica Wheeler, and Officer David Grissom went to the family home located at 731 Crosslin Street on July 14, 2014 to speak with [Mother] and [Father] and to assess the safety of [the Child]. CM Gardenhire located the family and asked both [Mother] and [Father] to submit to drug screens. They each consented and were positive for oxycodone. [Mother] was additionally positive for benzodiazepines. [Mother] admitted she was not prescribed either drug. [Father] stated that he previously had a prescription for Percocet, but was unable to produce a current prescription. CM noticed that [Father] had what appeared to be needle marks on his arms. [Father] initially blamed the marks on lances performed by doctors and various accidents at work. [Father] later admitted he had been injecting drugs using needles, but stated he had not done so in a couple of weeks. [Mother] was asked to show her arms as well and presented with needle marks and bruising. [Mother] admitted to the use of needles to inject drugs. She stated, "It is not as bad as it looks." She stated she does not like to use needles to inject the drugs. [Mother] admitted to CM Wheeler that she takes hydrocodone that is not prescribed to her once or twice a week (3 or 3 1/2) pills and that she also illegally obtains Percocet every once in a while.

On this date the family agreed to cooperate with the Department and participate in services in order to become drug free. On July 21, 2014 CM Gardenhire conducted another home visit and administered drug screens. [Father] and [Mother] continue to be positive for oxycodone. [Mother] reported that she had been to Highlands Medical Center on July 20, 2014 with a complaint/diagnosis of drug withdrawal and a urinary tract infection, during which time she was given Clonazepam and Clonidine.

On July 23, 2014 both [Mother] and [Father] completed an alcohol and drug consultation with Bradford Health Services at the Department of Children's Services in White County. Each parent was recommended to complete residential substance abuse treatment. [Mother] and [Father] made several telephone calls in attempts to contact family members and friends who they felt would be willing and able to care for [the Child]. After no one was readily available or willing,

[Mother] explained to CM Gardenhire that it might be in [the Child's] best interest to be into foster care until they can get things in order. She asked for time to discuss this with [Father]. After the conversation, [Father's mother] contacted him and let him know that his brother, [Aaron C.], and sister-in-law, [Crystal C.], were willing to be placement for [the Child]. CM Gardenhire asked about history with the Department of Children's Services and [Aaron C.'s] family and was only told that there was nothing serious and that there was no history with law enforcement.

On July 24, 2014, CM Gardenhire arrived at the family home to pick up [Mother] so she could go to New Leaf to begin her detoxification. [Mother] was not ready to go at this time and had previously text messaged CM Gardenhire asking to detox herself instead of going to treatment. [Mother] seemed very anxious at the time, but denied that she had used any drugs. [Mother] had a friend in the home at this time who attempted to help pick up around the home and to help [Mother] prepare her bags. [Father] was also present in the home at this time. He continually asked [Mother] to calm down as he tended to [the Child] and attempted to assist [Mother] in packing her bags. He did not appear to be under the influence at this time. CM Gardenhire arrived at the Plateau Mental Health Center with [Mother] half an hour late for her scheduled intake. [Mother's] pupils were dilated and she continued to appear to have been under the influence of something. CM Gardenhire asked [Mother] several times if she had used any substances, but she denied having used anything. [Mother] was unsteady on her feet at times and she began to repeat statements as she waited for her admission to be completed. She appeared to be dozing off to sleep in the waiting area and several times went to the restroom where she reported vomiting.

[Father] arrived at the DCS office with [Aaron and Crystal C.], his brother and sister-in-law, who wanted to be placement for [the Child]. [Father] appeared to be impaired at this time. CM Gardenhire noticed that his pupils were dilated, that he was sweating profusely, and that he was talking and moving about very fast. [Father] was very shaky and CM Gardenhire was concerned that he had taken some substance which [Father] initially denied. CM Gardenhire asked [Father] and his brother to submit to drug screens which they agreed to. CM Gardenhire again asked [Father] what he had taken since [Mother] had left the home. [Father] admitted that he had taken a Percocet which he had snorted. He also stated that he taken a Klonopin the previous night because he could not sleep. While CM Gardenhire and other case workers attempted to call rehabilitation facilities for [Father], he began to calm down. He was observed sitting in the chair and dozing off while CM was speaking with him. [Mr. Aaron C.] kicked his foot under the table a couple of times to wake him up. [Father] no longer appeared to be sweating and was very calm, but still appeared to be under the influence (dozing off).

19

[Mr. Aaron C.] and his wife [Crystal C.] were asked about their history with the Department of Children's Services. [Crystal C.] stated that there have been cases in the past but stated that they were all false. CM Gardenhire asked for more information on these from both [Mr. Aaron C.] and [Ms. C.]. [Mr. Aaron C.] stated that he had taken the children away from the home at one time because [Crystal C.] was abusing Xanax and the children were not safe. [Crystal C.] stated that she had made a false report to the police and the Department alleging that [Aaron C.] had abused their children. [Crystal C.] also reported that her children have been removed from her custody on two occasions; once about 8 years ago because she was abusing Xanax and five and a half years ago because her newborn was underweight. [Crystal C.] stated that her baby was being fed but that she was giving him the wrong type of milk. She also stated that she had placed an infant in a bouncy seat and propped up its bottle but that she did not strap the baby into the bouncy seat. She stated that she only placed the baby in the seat because a case manager was at the door. On July 24, 2014 [Mr. Aaron C.] tested positive for marijuana. [Cyrstal C.] provided CM Gardenhire with records from Owensboro Health Regional Hospital in Kentucky where she stated she had gone because of renal failure. CM Gardenhire questioned her on the reason for admission as the paperwork reported that she was being seen for back pain. [Crystal C.] reported that she also goes to a pain clinic for medication for her back. When CM Gardenhire asked why she was getting medication from the hospital when she was already getting medication from a pain clinic, [Crystal C.] became upset. She consented to a drug screen and was positive for barbiturates, benzodiazepine, opiates, and oxycodone. She reported having a prescription for Alprazolam, ergocalciferol, Neurontin, remeron, and Percocet. It was determined that this would not be a safe and appropriate placement for [the Child] at this time. [Mr. Aaron C.] agreed that foster care would be in [the Child's] best interest while [Father] and [Mother] were in rehab.

[Father] continued to wait for a space to become available in a residential facility. Due to an issue with [Father's] insurance and his deductible, he is still waiting on available space. CM Gardenhire and FSW Evans attempted contact and spoke to representatives from Bradford Health Services, Ten Broeck, and Cadas, in attempts to find a placement for [Father]. During this time [Father] spoke very openly about his addiction and the fact that he was ready to seek help that was long term and affective [sic]. [Father] reported to staff that he has arrived home from work to find [Mother] passed out on the bed and [the Child] sitting in a diaper that is so wet and soiled that it was yellow and that it could be smelled through the home. He stated that when he addressed this with [Mother], she simply stated that she "could not do it". [Father] stated that he has to clean house and makes sure that [the Child] gets cleaned up oftentimes after work as [Mother] has not done so during the day. [Father] stated that he felt responsible for

20

[Mother's] drug use as he started using with her three years ago in October when they began dating. He stated that her mother encouraged them to use drugs as well. He stated that he has used methamphetamine, morphine, dilaudid, heroin, morphine, and various other narcotics. He admitted that he has even injected the sleep medication, Ambien. [Father] admitted that he is an IV drug user but that he works and makes sure that [the Child] is taken care of.

In March of 2014, a case was closed with this family. [Father] tested negative for all substances tested on a urine drug screen at that time. [Mother] was positive for opiates and admitted to have taken what she thought was Tylenol from a friend. [Mother] agreed to have an alcohol and drug consultation at Bradford Health Services completed and the case was closed with the understanding that [Mother] would follow through with any recommendations made by Bradford Health Services.

[Mother] previously had three children removed from her custody. This was due to environmental neglect and substance abuse issues. [Mother] did not complete the requirements of her permanency plan and sole custody of those children was granted to their father in April 2013.

[Mother] and [Father] were never married. According to [Mother] and [Father], he is on the birth certificate. The Department does not have verification of this.

On July 25, 2014 CM Gardenhire spoke with [Dewey M.]. [Mr. Dewey M.] stated that he is married to [Mother] but that they are separated. [Mr. M. and Mother] were married when the minor child was born. [Mr. M.] stated he does not believe that he is the father of [the Child]. He stated that [Father] is the father of [the Child]. He stated that he is not in the position to care for another child and that the three that he has was taking all that he has. He stated that [Mother] has not done anything for the children and that she does not contact them at all. He reported that he knows that [Mother] is a junky.

17. The dispositional finding that [the Child] should remain in foster care was made on August 19, 2014 by the Juvenile Court of White County, Tennessee.

18. [The Child] has remained continuously in foster care since July 24, 2014.

19. [Mother has] . . . willfully failed to support said child for four (4) months immediately preceding the filing of this petition or the support paid in the four months immediately preceding the filing of this petition was token support. [Mother] has not contributed to the support of the child since at least July 24, 2014. . . . [Mother is] . . . able bodied and capable of working and supporting the child. Specifically, [Mother] testified to several jobs that she has had during the pendency of the case but she provided no support for the child. [Mother was] . . . aware of [her] duty to support the child. [Mother has] . . . made no attempt to

21

support the child and [has] provided no justifiable excuse for failing to support the child. . . . [Mother's] work history includes, but is not limited to factory work and working for a temporary agency.

20. [Mother] . . . willfully failed to visit said child for four (4) months immediately preceding the filing of this petition or the visits in the four months immediately preceding the filing of this petition were token visits. Prior to the filing of the petition, [Mother] . . . had not visited the child since some time in February 2015. After the petition was filed on July 7, 2015, [Mother] and [Father] visited on July 7, 2015 for 2 hours and [Mother] visited once more on October 1, 2015 for 2 hours. [Mother was] . . . aware of [her] duty to visit the child. [Mother] . . . knew the child was in foster care and knew how to schedule visits. Other than [Mother] scheduling one visit for June 29, 2015, which visit had to be rescheduled because the child was not available, their visit on July 7, 2015, and the mother's visit on October 1, 2015, [Mother has] . . . made no attempt to visit the child since February 2015 and [has] provided no justifiable excuse for failing to visit the child.

21. [Mother] was advised on September 23, 2014 and June 15, 2015 that willful failure to visit or contribute to the support of the child for four consecutive months was grounds for termination of parental rights. [Mother] signed the acknowledgement of receipt of the Criteria and Procedure for Termination of Parental Rights on September 23, 2014 and June 15, 2015.

22. . . . .

23. [Mother was ] . . . not incarcerated for the four consecutive months prior to the filing of this Petition.

24. Therefore [Respondent, Mother has] . . . abandoned [the Child] pursuant to Tenn. Code Ann. § 36-1-113(g)( 1) and Tenn. Code Ann. § 36-1-102(1)(A)(i) in that [she has] willfully failed to visit and [has] willfully failed to contribute to the support or make reasonable payments towards the support of said child for more than four (4) consecutive months prior to the filing of this Petition and therefore [her] parental rights should be terminated.

25. All of the permanency plans clearly identify in writing the parents' statement of responsibilities as being both the desired outcomes and actions steps listed in the plan.

26. The Respondent, [Mother], has not substantially complied with the provisions of the permanency plans and therefore her parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

27. The initial permanency plan dated August 19, 2014 has goals of return to parent and exit custody to live with relatives and requires her to:

1. Submit to random and scheduled drug screens to verify sobriety including both hair and urine drug tests.

2. Openly and honestly complete an alcohol and drug consultation and follow all recommendations.

3. Not use or abuse illegal or prescription drugs.

4. Not associate with any known drug users or drug abusers.

5. If drug treatment is recommended, [Mother] will actively participate in and complete the recommended treatment program.

The Court ratified the initial permanency plan on September 23, 2014 and found that the plan was reasonable, necessary and in the best interest of the child.

28. The revised permanency plan dated February 27, 2015 has goals of return to parent and exit custody to live with relatives and requires her to complete the same requirements as the previous permanency plan. The Court ratified the revised permanency plan on March 2, 2015 and found that the plan was reasonable, necessary and in the best interest of the child.

29. The revised permanency plan dated May 22, 2015 has goals of return to parent and adoption and required her to:

1. Complete a parenting assessment with Scott Herman and follow any and all recommendations from that assessment.

2. Obtain safe and stable housing that is suitable for herself and her child.

3. Obtain and maintain appropriate housing and ensure that there are working utilities at all times.

4. Ensure that there is an abundance of food for [the Child].

5. Provide DCS with current address and, if she moves, she will inform DCS within twenty-four (24) hours of her new address.

6. If funding is needed to obtain services, [Mother] will apply for TennCare, and, if denied, will provide documentation to the FSW so that funding can be obtained for services.

7. [Mother] will submit to random and scheduled urine, hair follicle, and mouth swab drug screens to verify her sobriety. If a test is refused, it will be deemed a failed drug test.

8. [Mother] will openly and honestly complete an alcohol and drug consultation and follow all recommendations.

9. [Mother] will not use or abuse illegal or prescription drugs.

10. If drug treatment is recommended [Mother] will actively participate in and complete the recommended treatment program.

11. [Mother] will not associate with known drug users or abusers.

12. [Mother] will openly and honestly complete a mental health assessment with Scott Herman.

13. If [Mother] is prescribed medication she will use the medication properly and as directed. [Mother] will discard any medication that is out of date or not

23

taken within the allotted time on the prescription. [Mother] will allow random pill counts.

14. If there are any recommendations from the mental health assessment [Mother] will follow them.

15. [Mother] will maintain contact with the FSW.

The Court ratified the revised permanency plan on June 8, 2015 and found that the plan was reasonable, necessary and in the best interest of the child.

30. The requirements in the permanency plans are all reasonably related to remedying the conditions that necessitate foster care. The requirements to become drug free, not associate with drug users, have stable mental health, and have safe and appropriate housing are particularly important in reducing the risk of harm to the child so that the child could be safely returned to the parent's care.

31. [Mother] has complied with some of her permanency plan requirements; however, the Court finds that she specifically took efforts to avoid drug screens and has routinely dyed her hair against the advice of her case manager. She also lacks stable housing and employment.

32. [Mother] was advised on September 23, 2014 and June 15, 2015 that failure to substantially comply with the permanency plans was grounds for termination of parental rights. [Mother] signed the acknowledgement of receipt of the Criteria and Procedure for Termination of Parental Rights on September 23, 2014 and June 15, 2015.

\* \* \*

40. The child has been removed from the custody of their parents for more than six (6) months; the conditions which led to the removal of the child from the home of [Mother] and [Father] still exist or other conditions exist which in all probability would cause the child to be subject to further abuse and/or neglect, making it unlikely that the child could be returned to them in the near future; there is little likelihood that these conditions will be remedied at an early date so that the child can be returned to [Mother] or [Father] in the near future; the continuation of the parent or guardian and child relationship greatly diminishes the child's chance of an early integration into a stable and permanent home and therefore their parental rights should be terminated pursuant to Term. Code Ann. § 36-1-113(g)(3).

41. The conditions that led to the removal of the child from the home of [Mother] and [Father] were drug use by [Mother] and [Father].

42. The conditions that prevent the child's return to the mother's home are as follows: the mother does not have a suitable home, she does not have a

legal means of income, and she has not had a period of sustained verifiable sobriety.

43. . . . .

44. [Mother] was advised on September 23, 2014 and June 15, 2015 that when a child has been removed from the parent more than six months and the parent fails to remedy the conditions that necessitate foster care, this was grounds for termination of parental rights. [Mother] signed the acknowledgement of receipt of the Criteria and Procedure for Termination of Parental Rights on September 23, 2014 and June 15, 2015.

\* \* \*

The Court finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence that termination of parental rights is in the best interest of the children based upon the following findings of fact.

46. [Mother] and [Father] have not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent. Tenn. Code Ann. § 36-1-113(i)(l) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

47. [Mother] and [Father] have not maintained regular visitation or other contact with the child. Tenn. Code Ann. § 36-1-113(i)(3) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

48. A meaningful relationship has not otherwise been established between the child and [Mother] and [Father]. Term. Code Ann. § 36-1-113(i)(4) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

49. A change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and/or medical condition. Tenn. Code Ann. § 36-1-113(i)(5) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

50. [Mother] has committed brutality, physical, sexual, emotional or psychological abuse or neglect toward other children in the family or household. In a prior DCS case [Mother] lost custody of her three other children due to environmental neglect and drug abuse. Tenn. Code Ann. § 36-1-113(i)(6) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

51. [Mother's] and [Father's] use of alcohol or controlled substances renders them consistently unable to care for the child on [sic] a safe and stable manner. Tenn. Code Ann. § 36-1-113(i)(7) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

52. [Mother] and [Father] have not paid child support consistently with the child support guidelines promulgated by the Department pursuant to Tenn. Code Ann. § 36-5-101. T.C.A. 36-1-113(i)(9) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

53. The Court is not limited to considering the factors set out in Tenn. Code Ann. §§. [sic] 36-1-113(i) 1-9 and should consider the following factors as well in determining whether termination of parental rights is in the best interest of the child.

54. [Mother] and [Father] have not paid a reasonable portion of the child's substitute physical care and maintenance when financially able to do so. The parents have not provided any food, clothing, diapers, toiletries, school supplies, books, toys, etc.

55. [Mother] and [Father] have shown little or no genuine interest in the welfare of the child.

56. [Mother] and [Father] continue to make lifestyle choices that prevent them from being able to parent the child or to provide a home for the child.

57. The child is placed in a foster home that wishes to adopt the child.

58. The child has established a strong bond with the foster parents.

Thus the Court finds that the Tennessee Department of Children's Services has proven by clear and convincing evidence that grounds for termination of parental rights exists and has proven by clear and convincing evidence that it is in the best interest of the child that all the parental rights of said Respondents to said child be forever terminated; and therefore the complete custody, control, and guardianship of said child be awarded to the State of Tennessee, Department of Children's Services, with the right to place said child for adoption and to consent to said adoption in loco parentis.

This Decree shall have the effect of terminating all the rights and obligations of the Respondents to said child and of the said child to the Respondents arising from the parental relationship, and the Respondents are not hereafter entitled to notice of proceedings for the adoption of the said child by another nor have they any right to object to such adoption or otherwise to participate in such proceedings.

**IT IS, THEREFORE, ORDERED ADJUDGED, AND DECREED:**

1. That the Respondent, [Mother] has willfully abandoned the minor child for more than four (4) consecutive months prior to the filing of this Petition; that she has failed to visit the child for the 4 consecutive months prior to filing this Petition; that she has been substantially non-compliant with the statement of responsibilities in the permanency plans; that the child has been removed from the custody of the parent more than six (6) months; that the conditions that led to the child's removal still exist or other conditions exist which would in all probability subject the child to further neglect or abuse if returned home; there is little likelihood that these conditions will be remedied at an early date so that the child could be returned to the Respondent in the near future; that the continuation of the parent/child relationship greatly diminishes the child's chances of early integration into a stable and permanent home; and that it is in the best interest of the child that all the parental rights of said Respondent to said child be forever terminated; and that the complete custody, control, and guardianship of said child be awarded to the State of Tennessee, Department of Children's Services, with the right to place said child for adoption and to consent to said adoption in loco parentis

Mother appeals the termination of her parental rights to the Child.

## Discussion

Although not stated exactly as such, Mother raises four issues on appeal: 1) whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights for abandonment by willful failure to visit and by willful failure to provide support pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i); 2) whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights for failure to comply with the Permanency Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); 3) whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and, 4) whether the Juvenile Court erred in finding that clear and convincing evidence had been shown that it was in the Child's best interest for Mother's parental rights to be terminated.

As our Supreme Court recently instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v.*

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states

27

*Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder

---

"[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

28

to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.,* 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights

is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered), *petition for cert. filed sub nom. Vanessa G. v. Tennessee Dep't of Children's Servs.*, ___ U.S. ___ (U.S. April 27, 2016) (No. 15-1317) .

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re: Carrington H.*, 483 S.W.3d at 526-27 (footnote omitted). As such, we review each of the grounds for termination.

We first consider whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights for abandonment by willful failure to visit and by willful failure to provide support pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i). As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2015). As pertinent to this appeal, Tenn. Code Ann. § 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

31

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2015).

Mother argues in her brief on appeal that the Juvenile Court erred in finding that she willfully failed to visit the Child during the four month period preceding the filing of the Petition because Grandmother testified that she did not stop supervising the visitations until February or March of 2015. Mother asserts that the Juvenile Court erred in relying upon the testimony of Ms. Evans that Mother had not visited since January of 2015, as DCS was not supervising the visits, and therefore, Ms. Evans was not aware of all of the visits that Mother had with the Child. Mother argues that the order from the review hearing entered on March 2, 2015, found that Mother was visiting regularly at that time.

The Petition was filed on July 7, 2015. Thus, the relevant four month period preceding the filing of the Petition started on March 7, 2015. Mother testified that she visited the Child until March of 2015. The record is devoid of evidence showing that Mother visited in April or in May of 2015. The record shows that a visit was scheduled to occur at the end of June, which was during the four month period preceding the filing of the Petition, but that visit had to be rescheduled through no fault of Mother. Given the facts and circumstances in this case, including giving Mother credit for the one visit in June, which was rescheduled, and accepting Mother's testimony that she visited in March, Mother's visitation during the four month period cannot be viewed as regular visitation. Even crediting Mother with a visit in March and crediting her with the visit that was scheduled at the end of June, this still leaves an almost three month period between scheduled visits. Mother gave no explanation as to why she failed to visit in April or May. Furthermore, Mother gave no explanation whatsoever as to why she did not, or could not, have visited more often during the relevant time period. Under the circumstances of this case, Mother's visitation can only be considered "token visitation," which Tenn. Code Ann. § 36-1-102(1)(C) defines as: "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C) (Supp. 2015).

32

The record reveals that Mother knew how to set up visitations and that she had at times contacted DCS to request visitation. Mother also argues in her brief on appeal that her failure to visit was not willful because Mother requested weekend visitation through DCS and was denied. Ms. Evans testified, however, that Mother made this request "recently," not during the four month period preceding the filing of the Petition. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding by clear and convincing evidence that grounds existed to terminate Mother's parental rights for abandonment by willful failure to visit.

The Juvenile Court also found that clear and convincing evidence was shown to terminate Mother's parental rights for abandonment by willful failure to support. Pursuant to Tenn. Code Ann. § 36-1-102(1)(H), Mother "is presumed to have knowledge of [her] legal obligation to support [her] child or children." Tenn. Code Ann. § 36-1-102(1)(H) (Supp. 2015). Ms. Evans testified that Mother has paid no support for the Child. Mother herself admitted that she has paid no child support. The evidence in the record on appeal shows that Mother was not incarcerated during the four month period preceding the filing of the Petition, at some indeterminate period of time was able-bodied and capable of working, and that Mother did indeed work at different times during the pendency of this case. Despite all this, Mother never paid any support for the Child.

The evidence, however, fails to show that Mother had the ability to pay child support during the relevant four month period preceding the filing of the Petition. The evidence shows that Mother lost her job in March of 2015 due to a diagnosis of Hepatitis C. Mother testified that she had been unable to find a job since that time. Thus, there is no evidence that Mother had the ability to pay child support during the relevant four month period. As such, Mother's failure to pay child support during the relevant four month period cannot be considered to be willful. As Mother's failure to pay child support during the relevant four month period cannot be considered to be willful, grounds to terminate her parental rights for abandonment by willful failure to provide support were not established by clear and convincing evidence. We, therefore, reverse that portion of the Juvenile Court's November 17, 2015 order terminating Mother's parental rights to the Child for abandonment by willful failure to provide support.

We next consider whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights for failure to comply with the Permanency Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). As pertinent, Tenn. Code Ann. § 36-1-113(g)(2) provides:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

33

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2015).

The evidence in the record on appeal shows that new requirements were added to the Permanency Plan shortly before trial. The evidence shows that Mother was not given sufficient time to complete these newly added requirements, although she did make an effort to complete some of them. Because Mother was not given sufficient time to complete the newly-added requirements, terminating her parental rights for failure to complete these requirements would violate due process.

The Juvenile Court found that while Mother had completed some of the requirements of the Permanency Plan, "she specifically took efforts to avoid drug screens and has routinely dyed her hair against the advice of her case manager . . . ." The evidence in the record on appeal does not preponderate against this finding made by clear and convincing evidence.

The Juvenile Court also found that Mother lacked stable housing and employment. The record, however, reveals that the requirements for Mother to maintain stable housing and employment were not in the original Permanency Plan. The record on appeal contains the original Permanency Plan dated August 19, 2014 and ratified on September 23, 2014, and the most recent Permanency Plan dated May 22, 2015 and ratified on June 8, 2015. These two plans were introduced as exhibits at trial. The record does not contain the revised Permanency Plan of February 27, 2015, which was ratified on March 2, 2015. A careful and thorough review of the record on appeal reveals that the requirements for Mother to maintain stable housing and employment do not appear in the August 19, 2014 Permanency Plan. These requirements do appear in the Permanency Plan of May 22, 2015, which was ratified on June 8, 2015. As noted above, however, Mother was not given sufficient time to comply with the requirements newly added to the Permanency Plan ratified on June 8, 2015. Given all this, we cannot say that clear and convincing evidence was shown that Mother substantially failed to comply with the statement of responsibilities in the Permanency Plan. We, therefore, reverse that portion of the Juvenile Court's November 17, 2015 order terminating Mother's parental rights to the Child for substantial noncompliance with the statement of responsibilities in the Permanency Plan.

Next, we consider whether the Juvenile Court erred in finding that grounds had been proven by clear and convincing evidence to terminate Mother's parental rights for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). As pertinent, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2015).

As discussed more fully above, the evidence shows that the Child was removed from Mother's custody by court order for a period of six months or more due to drug exposure. The Juvenile Court found by clear and convincing evidence: "The conditions that prevent the child's return to the mother's home are as follows: the mother does not have a suitable home, she does not have a legal means of income, and she has not had a period of sustained verifiable sobriety." The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings.

Importantly, the Juvenile Court found that conditions other than the conditions that led to the Child's removal, *i.e.*, Mother's lack of a suitable home and lack of a legal means of income, existed which would in all reasonable probability cause the Child to be subjected to further abuse or neglect. The evidence in the record on appeal shows that during the year and a half that the Child has been in State custody, Mother has had more than five addresses. Mother's current housing situation is dependent upon her boyfriend and her boyfriend's parents, whom she has known for a very short period of time. We also note that there is no evidence that Mother is contributing anything toward the cost of living with her boyfriend's parents. This situation can in no way be considered to be stable housing. Furthermore, the evidence shows that Mother has not had a job for months and has no legal means of income. We find no error in the Juvenile Court's finding that grounds were proven by clear and convincing evidence to terminate Mother's parental rights for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

35

Finally, we consider whether the Juvenile Court erred in finding that clear and convincing evidence had been shown that it was in the Child's best interest for Mother's parental rights to be terminated. When making a determination regarding the best interest of a child, the court shall consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i). We need not reiterate in detail the Juvenile Court's detailed findings relative to this issue as they are quoted fully above. The record reveals that the Juvenile Court considered all of the relevant factors and made detailed findings with regard to the best interest of the Child. The evidence in the record on appeal does not preponderate against the finding made by the Juvenile Court by clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated.

As grounds to terminate Mother's parental rights to the Child for abandonment by willful failure to visit and for persistent conditions were proven by clear and convincing evidence, and it was shown by clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated, we affirm that portion of the Juvenile Court's November 17, 2015 order terminating Mother's parental rights to the Child for abandonment by willful failure to visit and for persistent conditions.

## Conclusion

The judgment of the Juvenile Court is affirmed, as modified, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Briana M.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

36